FILED'06 MAR 28 14:24USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KAREN SHARR; ET AL.,                )
                                    )
                  Plaintiffs,       )        Civil No. 02-1513-JO
                                    )
            v.                      )        <u>OPINION AND ORDER</u>
                                    )
NCS PEARSON, INC.,                  )
                                    )
                  Defendant.        )

David D. Park
ELLIOTT & PARK
0324 S.W. Abernethy Street
Portland, OR 97201-4356

Don S. Willner
DON S. WILLNER & ASSOCIATES, PC
630 Sunnyside Road
Trout Lake, WA 98650

Mary Ellen Page Farr
0324 S.W. Abernethy Street
Portland, OR 97201

    Attorneys for Plaintiffs

Carlton E. Greene
UNITED STATES DEPARTMENT OF JUSTICE
Federal Programs Branch, Civil Division
P. O. Box 883
Ben Franklin Station
Washington, D.C. 20044

John G. Azar
John G. Knepper
Martha S. Edney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Room 7216
Washington, D.C. 20530

Ronald K. Silver
UNITED STATES ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

Courtney C. Dippel
Louis A. Santiago
HOLLAND & KNIGHT, LLP
111 S.W. Fifth Avenue, Suite 2300
Portland, OR 97210

     Attorneys for Defendants

JONES, Judge:

On February 24, 2006, I granted defendant's motion for summary judgment (# 257)

directed solely to the issue of whether, as a matter of law, plaintiffs' disparate impact

discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the

Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act

("ADEA") were preempted by the Aviation and Transportation Security Act, Pub. L. No. 107-71,

115 Stat. 597 ("ATSA").


PAGE 2 - OPINION AND ORDER

Defendant now moves for summary judgment (# 262) on plaintiffs' disparate treatment discrimination and retaliation claims under Title VII, the ADA, and the ADEA, and on plaintiffs' state common law claims of intentional interference with economic relations ("IIER"). For the reasons explained below, I grant defendant's motion in part and deny it in part. Specifically, I grant defendant's motion for summary judgment on all plaintiffs' federal disparate treatment and retaliation claims, and on all but 23 plaintiffs'[1] state common law claims.

## INTRODUCTION[2]

In the wake of the September 11, 2001, hijacking of four commercial airliners Congress found it necessary to require "a fundamental change in the way [the United States] approaches the task of ensuring the safety and security of the civil air transport system." Aviation and Transportation Security Act, H.R. Rep. 107-296 at 53 (2001). On November 19, 2001, Congress passed the ATSA, which established the Transportation Security Administration ("TSA"), and charged that agency with replacing the private sector security screeners who worked for the airlines or security agencies at 429 commercial airports nationwide with a federalized workforce responsible for all phases of passenger and baggage screening. This massive changing of the guard was to be completed by November 19, 2002, for passenger screening personnel, and by December 31, 2002, for baggage screening personnel. See 115 Stat. 615-16.

The ATSA mandated that all security screener candidates pass a "federal security screening personnel selection examination," and meet specific statutory requirements regarding

---

[1]    See page 23, infra, for a list of the remaining plaintiffs.

[2]    The parties are not in total agreement regarding the background facts. Any genuine issue concerning the disputed background facts does not affect my ruling, however, because the disputed facts are not material to my decision.

competence, integrity, and physical ability. See 49 U.S.C. §§ 44935(e)(2)(A), (f)(1). Pursuant to

its statutory authority, TSA established a single, comprehensive assessment standard for airport

security screener candidates. "Notwithstanding any other provision of law," a candidate could

not be hired as a security screener unless he or she met the requirements of the ATSA and passed

TSA's selection examination. See ATSA § 111, codified as 49 U.S.C. § 44935(e)(2)(A) (hiring

qualifications) and § 44935(f)(1) (employment standards for screening personnel).

The United States Department of Transportation solicited bids from contractors to

support TSA during the nationwide screener assessment process; the contract was awarded to

defendant NCS Pearson, Inc., on February 25, 2002. Pursuant to the contract, defendant was

responsible for providing assessment center facilities, providing testing equipment and staff,

scheduling candidate assessments, conducting the required tests and interviews, identifying

qualified candidates, and assisting in awarding job offers from TSA. The assessment process and

guidelines were designed by TSA, and this standardized assessment was supposed to be applied

uniformly at all of the examination centers. In theory, candidates took the same tests, were given

the same instructions, and were read the same scripts whether they were tested in Ohio or

Oregon.

To be re-hired as a federal security screener with TSA, all private sector security

screeners were required to receive passing marks on TSA's selection examinations. See ATSA

§ 44935(e)(2)(A). The 58 individual plaintiffs, who were employees of Huntleigh USA

Corporation ("Huntleigh") or Olympic Security Services ("Olympic"), were incumbent security

screeners in Oregon airports before implementation of the ATSA who were not re-hired by TSA

because -- with one exception -- each failed to pass some portion of TSA's selection

PAGE 4 - OPINION AND ORDER

examinations.[3]  Plaintiffs allege that defendant did not engage in a fair assessment process and instead used the tests to disqualify plaintiffs, even though TSA had guaranteed plaintiffs employment if they passed the selection examinations, because defendant had already filled the available federal screener positions with new candidates. (See Sixth Amended Compl. ¶¶ 10, 15.) Plaintiffs also allege that the testing process put in place by defendant was used to disqualify former Huntleigh screeners because of their gender, age, race, national origin, and/or disability, and in some instances to retaliate against incumbent screeners.  (See id. at ¶¶ 15-17, 20.)

### THE PRESENT MOTION

In the present motion, defendant contends that plaintiffs' disparate treatment claims fail because none of the plaintiffs can put forth sufficient evidence to establish a *prima facie* discrimination case; specifically, defendant argues that all of the plaintiffs lack either direct or indirect evidence that gives rise to an inference of unlawful discrimination, or that can be used to rebut defendant's legitimate, non-discriminatory reasons for not extending an employment offer with TSA.  Defendant also contends that it cannot be held liable as an employment agency because TSA is exempted from the statutory definitions of an employer under Title VII, the ADEA, and the ADA.[4]

---

[3]    Dominic Damiani was the only plaintiff who passed all phases of the screener selection examinations and was offered a full-time job with TSA, which he rejected.  Three plaintiffs simply did not complete the testing process due to medical holds which prevented them from taking Phase II of the examination prior to the closure of the Portland assessment center. However, the remaining 54 plaintiffs failed to receive passing marks on some portion of TSA's screener selection examinations.

[4]    I rejected this theory in a prior ruling.  See Sharr, et al. v. NCS Pearson, Inc., Civil No. 02-1513-JO (Minute Order, March 30, 2004).

PAGE 5 - OPINION AND ORDER

Regarding plaintiffs' state common law claims, in which plaintiffs allege that defendant intentionally interfered with TSA's alleged agreement to give former screeners preference in hiring if they passed the selection examinations, defendant argues that the claims are preempted by the ATSA. Alternatively, defendant contends that plaintiffs' claims fail as a matter of law because no plaintiff can satisfy all of the required elements of the IIER claim. Specifically, defendant asserts that plaintiffs cannot establish (1) that defendant was a third party to their relationship with TSA because defendant was acting as TSA's agent and at TSA's direction at all material times; and (2) that defendant's alleged intentional interference was accomplished through improper means or for an improper purpose.

I.    **The Security Screener Assessment Process**

The first assessment centers opened in the latter half of June, 2002; however, the assessment center located in Portland, Oregon, did not commence operations until September 2, 2002. Early in the assessment process, several of the test airports experienced screener staffing problems because incumbent screeners were leaving their checkpoints to take the examinations, thereby causing numerous delays and flight cancellations. To ensure that large airports such as Portland International Airport ("PDX") remained operational during the security screener assessment process, TSA responded by ordering that incumbent screeners be scheduled to take their examinations after the passenger screening process had been federalized and sufficient numbers of trained TSA screeners were deployed.

Before arriving at the assessment centers, candidates applied for up to three different screener positions: transportation security screener ("Screener"), lead transportation security screener ("Lead Screener"), and/or supervisory transportation security screener ("Supervisory

PAGE 6 - OPINION AND ORDER

Screener"). Upon arrival at the Portland assessment center, candidates checked in at a "Welcome

Desk," where defendant's staffers used highlighter pens to show on a list of names which

candidates had arrived. Groups of approximately twenty-five candidates were then sent to a

security briefing prior to commencing testing. Defendant's staffers used different highlighter

colors to distinguish new arrivals who had not received the security briefing from those who had,

and from candidates who had not yet checked in. Candidates also received wristbands of various

colors, which corresponded to three different testing sessions per day. Defendant also used the

wristbands as a visual aid to ascertain that candidates were moving through the assessment

stations in proper order.[5]

The testing process was divided into discrete segments, called Phase I and Phase II.

During Phase I, candidates were required to take three timed tests delivered on a computer: the

TSA Competency Inventory, the Screener Object Recognition Test ("SORT"), and an English

Fluency examination. If a candidate did not receive passing scores on the Phase I tests, the

assessment process ended and he or she was not permitted to proceed to Phase II. During

Phase II, each candidate completed a structured interview, a medical evaluation, physical

performance tests, and a background check.

### A.    __Phase I testing__

Before beginning the testing, candidates received a TSA Candidate Rules Checklist,

which informed candidates that if they experienced hardware or software problems they were to

notify the exam administrator by immediately raising a hand; otherwise, the administrator could

---

[5]        I note that a number of plaintiffs base their discrimination and IIER theories, in part, on their observations of highlighted lists of names and differently colored wristbands during the assessment process.

PAGE 7 - OPINION AND ORDER

only log candidates on to a workstation and show them how to start the assessment programs. Exam administrators were prohibited from answering any assessment-specific questions.

The TSA Competency Inventory consisted of a set of 168 questions designed to measure a candidate's potential to succeed at one of three airport security screener positions (Screener, Lead Screener, or Supervisory Screener) by assessing a candidate's knowledge, skills, and abilities in the areas of customer service, work values, responsibility/integrity, and supervision. It was also intended to measure candidates' reading and writing skills and abilities, as required by the ATSA. See 49 U.S.C. § 44935(f)(C) (listing specific English skills). TSA determined the minimum score required to pass.

The SORT exam, which was created by Federal Aviation Administration psychologists, measured candidates' ability to recognize and distinguish shapes and images in simulated x-rays of baggage shown on a computer screen. The ATSA specifies that "[s]creeners operating any screening equipment shall be able to distinguish each color displayed on every type of screening equipment and explain what each color signifies." 49 U.S.C. § 44935(f)(B)(ii). Again, TSA set the minimum score required to pass.

Finally, the English Fluency examination was given to all candidates, pursuant to the ATSA's specifications. See 49 U.S.C. § 44935(f)(C). However, the English Fluency exam was never scored; after candidates completed the test their results were marked as "taken" or "not taken." Therefore, none of the plaintiffs failed Phase I of the testing based on his or her performance on this portion of the assessment.[6]

---

[6]     Several plaintiffs based their claims of discrimination due to race or national origin on the fact that the testing emphasized English language skills.

PAGE 8 - OPINION AND ORDER

Due to security concerns, the contents and scoring algorithms of the TSA Competency Inventory and the SORT exams were encrypted on defendant's network server at the assessment center. Defendant's computer software, which was running on each individual test station, collected that candidate's responses and immediately calculated, encrypted, and stored the candidate's scores on defendant's network server for transmission to defendant's central database. The tests' scoring algorithms consisted of compiled computer code that could not be interpreted or modified by humans or other computer programs; therefore, it was virtually impossible for plaintiffs' Phase I test scores to have been manipulated by defendant at the Portland assessment center.

During Phase I, all candidates took the same tests, regardless of the screener position for which they had applied. So, a candidate who applied for the highest-ranking Supervisory Screener job took the same tests as someone who applied for the lowest-ranking Screener position; however, a candidate was required to achieve a higher score on the "supervision" content areas in order to qualify for the top job. If a candidate applied for a Supervisory Screener or Lead Screener position, but passed only at the Screener rank, he or she would still have passed Phase I and been qualified for a job as a basic Screener.[7]

**B.    Phase II testing**

The only portions of the Phase II testing at issue in this case involve the medical evaluation and the physical abilities tests. Defendant hired a subcontractor, Comprehensive Health Services, Inc. ("CHS") to conduct these portions of the security screener assessment

---

[7]    Several plaintiffs complained that they had applied for a lower-level screener position, but were compelled to take the tests for a higher-level position, thereby causing them to fail Phase I. Of the 58 current plaintiffs, 31 failed one or more of the Phase I examinations.

PAGE 9 - OPINION AND ORDER

process.  If a candidate did not pass or otherwise successfully complete the medical evaluation, he or she was not permitted to take the physical performance tests.

### 1.    Medical evaluations and related issues

To conduct the medical evaluation, each assessment center had a combination of nurses, nurse practitioners, physician assistants, and physicians who administered the various examinations.  Candidates were given a hearing exam, a vision exam, a vital signs test, a drug test, and a full physical examination, including an orthopedic assessment.  Candidates were also required to review their medical history in an interview with a medical practitioner.  TSA's medical requirements were incorporated into standardized forms, which were intended to guide the medical staff members through the data collection and reporting processes.  The medical evaluation was designed to be uniformly administered at assessment centers nationwide, using a standardized process with standardized components, and utilizing the same paperwork.

TSA, based on the ATSA requirements, set precise standards for candidates' vision, including color perception; blood pressure; and orthopedic capacity, including the medically unrestricted ability to lift and carry baggage weighing up to 70 pounds.  If one of the medical staff members observed that a candidate did not satisfy TSA's physical fitness requirements, additional follow-up may or may not have been ordered, depending on the candidate's particular medical condition.  A candidate with a permanent uncorrectable condition such as color-

PAGE 10 - OPINION AND ORDER

blindness or lack of capability to repeatedly lift 70 pounds, which would prevent him or her from meeting TSA's requirements, was designated as a "medical fail," and was disqualified from employment as a TSA security screener.[8]

Candidates with correctable conditions such as nearsightedness, farsightedness, high blood pressure, or temporary lifting restrictions were placed on "medical hold" and were given paperwork requiring them to have follow-up examinations with their personal physicians to obtain additional medical information. Such candidates were informed that they were still eligible for employment, but would remain on medical hold until their physicians verified that the medical condition(s) at issue were corrected. The instruction paperwork included a toll-free number to call if a candidate had questions about the follow-up medical process, and also provided the fax number and address for CHS's corporate office, where a candidate was directed to submit his or her completed medical hold paperwork.

CHS medical personnel reviewed the affected candidate's additional medical data after receiving the required paperwork from the candidate's physician. If the physician reported that the candidate's medical condition did not meet TSA's requirements, CHS disqualified the candidate; however, if the physician certified compliance with TSA's standards, CHS designated the candidate as "cleared" and was supposed to be scheduled to complete the remainder of Phase II. Problems arose when TSA closed the local assessment centers, including the one in Portland, by October 18, 2002, and closed the five remaining "super centers" by November 19, 2002, so that several incumbent screeners were denied the opportunity to complete their Phase II

---

[8]     Two plaintiffs failed the medical evaluation because they had permanent or uncorrectable conditions: Joshua Meisenheimer (color-blindness), and Velma Gunn (25-pound lifting restriction due to lower lumbar strain).

PAGE 11 - OPINION AND ORDER

assessments.[9]  TSA would not authorize defendant to schedule any further assessments after the

super centers closed; accordingly, TSA became responsible for completing the assessments.

### 2.    Physical abilities testing and related issues

The physical abilities testing was comprised of two separate examinations:  the luggage

lift test, and the baggage search test.[10]  During the luggage lift test, administrators were supposed

to read scripted general instructions to the candidates, who were then tested one at a time in a

closed testing area.  The timed test involved moving boxes of varying weights, labeled with the

numbers 1, 2, 3, and 4, from their designated spaces on the floor to their designated spaces on a

table.  Again, reading from a script, the test administrator directed a candidate to lift the series of

four boxes in a specific sequence, alternating from the table to a designated place on the floor.

The administrator recorded each "completed move" on a score sheet, as well as any failures to

follow instructions, such as running during the test or skipping boxes.  To meet TSA's standard, a

candidate had to move at least sixteen boxes in a three-minute period.[11]

TSA standardized the luggage lift test, and it was supposed to be uniformly administered

nationwide.  The numbered boxes contained the same weights, every candidate was directed to

go through the same series of events, and the order in which the numbered boxes were lifted was

part of the predefined test.  Nevertheless, the factual record shows that there were some minor

anomalies associated with the Phase II luggage lift test, although the evidence is very weak as to

---

[9]    Plaintiffs William Damron and Linda Ocampo both needed to complete the
physical abilities tests, and have not done so as of the date of this disposition.

[10]    None of the plaintiffs failed the baggage search tests.

[11]    Of the 58 plaintiffs, 20 failed the Phase II luggage lift test.

whether the anomalies amount to unlawful discriminatory treatment.

II.   **Legal Analysis of Plaintiffs' Claims**

Plaintiffs do not dispute defendant's general descriptions of the Phase I and Phase II tests, and admit that defendant has articulated legitimate, nondiscriminatory reasons for the employment decisions at issue in this case; thus, defendant has satisfied its burden of production. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Accordingly, the issues remaining to be resolved at the summary judgment stage with respect to plaintiffs' federal disparate treatment discrimination and retaliation claims are as follows: (1) are plaintiffs' federal disparate treatment claims cognizable in light of the ATSA: (2) has each plaintiff established his or her *prima facie* case; and if so, (3) has each plaintiff provided the specific and substantial evidence necessary to show that defendant's reasons for disqualifying him or her were a pretext to accomplish intentional discrimination? See Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 663-64 (9th Cir. 2002).

With respect to the plaintiffs' state common law claims, two questions remain: (1) is Oregon common law preempted by the ATSA; if not, (2) has each plaintiff established his or her *prima facie* case for intentional interference with economic relations?

To defeat defendant's motion for summary judgment, plaintiffs must present admissible evidence showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party." Anderson v. Liberty Lobby, Inc., 477 U.S.

PAGE 13 - OPINION AND ORDER

242, 252 (1986).[12]

A.     **Federal Claims**

I first note that defendant moves for summary judgment on plaintiffs' ADA disparate treatment claims based on ATSA preemption, but not on plaintiffs' Title VII or ADEA claims. In ruling that the ATSA preempts plaintiffs' disparate impact claims, I explained that the plain language of the ATSA evinces Congress' intent to exempt TSA from the intricacies of the otherwise applicable labor and employment laws to expedite the process of hiring and training the necessary workforce. I further explained that the testing process was designed to ensure that airport security screeners are bright, capable, literate, and physically and mentally able to perform the demands of the screener jobs. See Sharr, et al. v. NCS Pearson, Inc., Civil No. 02-1513-JO (Opinion and Order, Feb. 23, 2006), p. 5. To that end, TSA created a facially neutral test to ensure that regardless of any candidate's membership in one or more protected class, only persons who passed the test were eligible and suitable for hire, and those who did not pass the test were not.

Against this background, and in light of Congress' intent in enacting the ATSA, I conclude that plaintiffs' ADA disparate treatment claims based on actual or perceived disability are preempted. Only three plaintiffs produced evidence suggesting even a remote possibility of disparate treatment discrimination based on perceived disability (Faith Malcolm, Robert Tappert, and Diana Wadley), but even if those three claims might otherwise survive summary

---

[12]     Federal courts use the standards of Fed. R. Civ. P. 56 in evaluating a motion for summary judgment directed to a state law claim, even if the state summary judgment rule would produce a different result. See Schwarzer, Tashima & Wagstaffe, RUTTER GROUP PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2005), p. 1-35, ¶ 1:57.4 and the cases cited therein.

PAGE 14 - OPINION AND ORDER

judgment, they are preempted and not cognizable in this court.  I do not need to determine

whether the ATSA similarly preempts Title VII and ADEA disparate treatment claims because,

as discussed below, no plaintiff has submitted specific and substantial evidence sufficient to

survive defendant's motion for summary judgment on those claims.

## 1.    Title VII discrimination claims

To survive summary judgment on their Title VII claims, plaintiffs must produce evidence

sufficient to establish that defendant, acting as an employment agency, "fail[ed] or refuse[d] to

refer for employment or otherwise discriminate[d] against Plaintiffs because of their race, color,

religion, sex or national origin." 42 U.S.C. §§ 2000e-2(b).  "The McDonnell Douglas analysis

imposes on the plaintiff an initial burden of establishing a prima facie case of discrimination; . . .

[in order to] establish a prima facie case, a plaintiff must offer evidence that 'give[s] rise to an

inference of unlawful discrimination.'" Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th

Cir. 1998) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248,  253 (1981)).

In this case, where there is an absence of direct evidence of discrimination, the elements

of a Title VII disparate treatment claim that each individual plaintiff must prove are as follows:

(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position

for which he or she applied; (3) the plaintiff was rejected for employment or otherwise subjected

to an adverse employment action by defendant; and (4) the plaintiff was treated differently than

similarly situated persons outside of his or her protected class(es).  See McDonnell Douglas, 411

U.S. at 802; see also Chuang v. University of California Davis, 225 F.3d 1115, 1123 (9th Cir.

2000).  "The requisite degree of proof necessary to establish a prima facie case for Title VII . . .

on summary judgment is minimal and does not even need to rise to the level of a preponderance

PAGE 15 - OPINION AND ORDER

of the evidence." Godwin, 150 F.3d at 1220 (internal citations omitted).

### 2.    ADEA discrimination claims

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)). A plaintiff must therefore demonstrate that his or her age "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." Hazen Paper Co., 507 U.S. at 604.

The analysis for plaintiffs' ADEA claims is essentially the same as that for their Title VII claims: plaintiffs must establish a *prima facie* case of age discrimination to survive summary judgment. See McDonnell Douglas, 411 U.S. 792; Wallis v. J.R. Simplot Co., 26 F.3d 885, 888 (9th Cir. 1994) Individual plaintiffs claiming age discrimination must therefore prove that they: (1) were over 40 at the time of the alleged discriminatory incidents; (2) were qualified for employment; (3) were rejected for employment or otherwise subjected to an adverse employment action; and (4) were replaced by substantially younger persons with equal or inferior qualifications. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-12 (1996); 29 U.S.C. § 631(a). Age must be the "motivating factor" in the rejection or adverse employment action. See Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d 802, 811 (9th Cir. 2004).

PAGE 16 - OPINION AND ORDER

### 3.    Plaintiff's individual Title VII and ADEA claims

Plaintiffs contend that they generally have established the elements of their Title VII and ADEA claims by submitting both statistical and anecdotal evidence showing that defendant's "sham testing" was a pretext for discriminatory hiring practices.  The anecdotal evidence consists of allegedly biased remarks several plaintiffs claim to have overheard at the Portland assessment center, and affidavits of former Olympic Security, Inc., employees who took the assessments at other centers, and overheard similar remarks.[13]

Plaintiffs also offer the declaration of Robert R. Sinclair, Ph.D., who performed a statistical analysis of the individuals who had previously been employed by Huntleigh at PDX, and found that defendant's TSA Competency Inventory exam adversely impacted women, people over forty, and Asian/Pacific Islanders.  (Sinclair Decl., at 2-3.)[14]  In addition, Dr. Sinclair attests that defendant did not administer the TSA Competency Inventory in conformity with the professional standards for test administration because candidates were treated differently, and there were no procedures in place to review the fairness of validity of the test.  (Id. at 4-5.)  In the Ninth Circuit, "a plaintiff who offers substantial evidence that the employer's proffered reasons were not reliable . . . has made a sufficient showing to create triable issues with respect to the employer's motivation."  Godwin, 150 F.3d at 1219 (internal citations omitted).

---

[13]    Defendant has moved to strike this evidence; indeed, the parties have filed extensive motions to strike directed to each other's submissions (see ## 350, 421, 422, 423). Because I do not rely on inadmissible evidence in this decision, the motions are denied as moot, with leave for the parties to raise any relevant objections at the final pretrial conference.

[14]    Dr. Sinclair did not analyze any impacts based on applicants' national origin or disability discrimination claims.  Also, Dr. Sinclair admitted that his analysis showed no adverse impact on African-Americans or Hispanic applicants.  (Sinclair Decl., at 3.)

PAGE 17 - OPINION AND ORDER

Defendants contend, and I agree, that while Dr. Sinclair's statistical analysis may, if otherwise admissible under Rule 702, be probative on the issue of disparate <u>impact</u>, I have already ruled that ATSA preempts the impact claims. Dr. Sinclair's analysis may be probative in evaluating plaintiffs' individual disparate treatment claims, but only in those individual cases where plaintiffs have provided some other evidence tending to prove their *prima facie* claims. This is not a "pattern or practice" case; consequently, statistical evidence cannot provide the sole evidence of individual discriminatory treatment. Instead, statistical evidence comes into play as circumstantial evidence that could, "if sufficiently probative, point to bias" and negate the defendant's explanation of the adverse employment decision as "unworthy of credence." <u>Coghlan v. American Seafoods Co. LLC</u>, 413 F.3d 1090, 1095-96 (9th Cir. 2005)(citations omitted); <u>see also</u> <u>Obrey v. Johnson</u>, 400 F.3d 691, 694-95 (9th Cir. 2005)(in a "pattern or practice" case, statistical evidence may constitute prima facie proof of a pattern or practice of discrimination; in other cases, statistical evidence is helpful in showing that an employer's articulated reason for the employment decision is pretextual (citations omitted)).

More direct are the factual reports of the individual plaintiffs themselves, some of which contain direct observations of allegedly discriminatory remarks made by TSA personnel and/or assessment center staff. Whether those remarks amount to the "specific and substantial" evidence necessary to establish pretext must be decided on a case-by-case basis. <u>See</u> <u>Aragon v. Republic Silver State Disposal Inc.</u>, 292 F.3d 654, 663-64 (9th Cir. 2002) (statistical evidence does not account for possible nondiscrimination variables, such as job performance).

With respect to those plaintiffs who failed the Phase I computer-based examinations, plaintiffs have failed to provide specific and substantial evidence demonstrating that the Phase I

PAGE 18 - OPINION AND ORDER

testing was fundamentally unreliable. Although a number of plaintiffs complain about test

conditions (inadequate lighting, system crashes, people talking during the test), plaintiffs present

no evidence that any of their Phase I scores were manipulated to cause them to fail because of

their race, color, religion, sex, national origin, age, or disability. On this issue, I have considered

plaintiffs' supplemental submissions, and I am not persuaded that the alleged irregularities in the

Phase I testing amounted to disparate discriminatory treatment. The ATSA specifically required

certain capabilities, and the 31 plaintiffs who failed to pass the Phase I testing simply were not

qualified for the job of TSA security screener. With respect to those 31 plaintiffs, defendant's

motion for summary judgment is granted as to their federal and state claims. Defendant's motion

is also granted as to all claims of plaintiff Damiani, who passed both Phase I and II but turned

down TSA's job offer, and the ADEA claim of plaintiff Mingzhor.[15]

Plaintiffs similarly have not shown that the Phase II physical capacity tests were

fundamentally unreliable. The ATSA required that security screeners possess certain physical

skills, such as full-color vision, the ability to repeatedly lift and carry up to 70 pounds, and to

generally be fit for daily duty. See generally 49 U.S.C. § 44935(e) and (f). TSA designed its

assessments to evaluate candidates' fitness for employment. The record shows that five

plaintiffs[16] who failed the medical evaluation, or were placed on "medical hold," had an objective

---

[15]    Mingzhor failed the Phase I test at the Los Angeles testing center. His complaint is that he was not allowed to retest in the Portland testing center. No evidence supports Mingzhor's age-based discrimination claim.

[16]    These five are: William Damron, Judith Detmer, Velma Gunn, Joseph Meisenheimer, and Linda Ocampo. Of these five, Velma Gunn and Joseph Meisenheimer never cleared their medical holds and, therefore, have no valid federal or state law claims because they never qualified for TSA employment.

PAGE 19 - OPINION AND ORDER

condition which prevented them from meeting TSA's standards; there is no evidence that their

test results were manipulated to prevent them from passing based on membership in a protected

class. These five plaintiffs were not qualified for employment as TSA screeners as of the date of

their assessments; accordingly, they have failed to establish their *prima facie* cases for disparate

treatment discrimination.

A few of the 20 plaintiffs who failed the Phase II luggage lift test have shown minor

anomalies in the testing and scoring process, and plaintiffs' evidence suggests that the Phase II

luggage lift test was not administered as consistently as other tests so that there may have been

some room for manipulation in the scoring. While plaintiffs may be correct that the luggage lift

test was not necessarily always administered according to TSA's scripted and standardized

design, plaintiffs have failed to present any evidence that the anomalies observed in the

administration and scoring of the Phase II luggage lift exam were the result of discriminatory

animus in violation of Title VII, the ADEA, and even the ADA.

In sum, defendant's motion for summary judgment on plaintiffs' Title VII, ADEA, and

ADA claims is granted.

### 4.   Retaliation claims

Two plaintiffs, Dominic Damiani and Diana Wadley, allege retaliation claims. Assuming

without deciding that the retaliation claims are cognizable, neither claim survives on the merits.

To prove retaliation, these plaintiffs must show that (1) they engaged in a protected activity; (2)

defendant subjected them to an adverse employment action; and (3) there is a causal link between

the protected activity and defendant's action. See Bergene v. Salt River Project Agr. Imp. and

Power, 272 F.3d 1136, 1141 (9th Cir. 2001) (Title VII claim). A "protected activity" includes

PAGE 20 - OPINION AND ORDER

opposing unlawful employment practices, or making a charge, testifying, assisting, or participating in any manner in an investigation,  proceeding or hearing alleging discrimination. See Bahri v. Home Depot USA, Inc., 242 F.Supp.2d 922, 952 (D.Or. 2002); 42 U.S.C. § 2000e-3(a) (Title VII); 29 U.S.C. § 623(d) (ADEA); 42 U.S.C. § 12203 (ADA).  Each plaintiff must provide evidence to show that defendant was aware that the plaintiff engaged in the protected activity at issue and, to establish the causal link, each plaintiff must present evidence sufficient to raise the inference that the protected activity was the likely reason for the adverse employment action.  Bahri, 242 F.Supp.2d at 953.

Damiani and Wadley have failed to establish their *prima facie* cases.  Neither plaintiff has shown that he or she was engaged in a "protected activity" with respect to defendant, nor has either plaintiff shown that a causal link between any alleged protected activity and the failure to obtain TSA screener positions.  Consequently, I grant defendant's motion with respect to plaintiffs' retaliation claims.

**B.**     **State Common Law IIER Claims**[17]

All 58 plaintiffs allege a state common law claim for IIER.  The elements of this claim are:  (1) the existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage); (2) intentional interference with that relationship

---

[17]        Defendant contends that the ATSA preempts plaintiffs' state common law claims. I reject that argument because, while I have found that Congress signaled a clear intent to supplant federal law claims, I am not persuaded that it intended to do so with respect to state common law claims.  See Conyers v. Merit Systems Protection Bd., 388 F.3d 1380, 1383 (Fed. Cir. 2004)(whether a "notwithstanding any other provision of law" clause preempts state law is a question that turns on congressional intent)(citing E.P. Paup Co. v. Dep't of Labor, 999 F.2d 1341, 1348-49 (9th Cir. 1993) (explaining that a "notwithstanding" clause "does not always provide a clear indication that Congress intended to preempt, particularly when there is legislative intent to the contrary")).

PAGE 21 - OPINION AND ORDER

or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages.  Allen v. Hall, 328 Or. 276, 281, 974 P.2d 199 (1999) (citations omitted).

If, in fact, TSA agreed to give priority in hiring to Huntleigh or Olympic employees, it was conditioned on passing the screener selection examinations and accepting the job if offered. The 31 plaintiffs who failed Phase I, the two plaintiffs who never cleared their medical holds, and plaintiff Damiani (34 plaintiffs), cannot prove that they met these conditions of employment. Additionally, plaintiff Mingzhor failed the Phase I test in Los Angeles and has not presented any evidence that defendant's failure to allow him to retest six months later in Portland constituted intentional interference with Mingzhor's prospective business relationship with TSA accomplished through an improper means or for an improper purpose.  Consequently, defendant's motion for summary judgment as to these 35 plaintiffs' state law claims is granted.

With respect to the remaining 23 plaintiffs, their state claims succeed or fail based on the fourth element of an IIER claim.  Plaintiffs contend that defendant failed to validate its assessment process while administering the tests to verify that the tests were actually being given according to TSA's standards, and that defendant's failure to do so violates professional standards of examination administration, thereby amounting to "improper means."  In the context of this litigation and plaintiffs' allegations, to establish "improper means" or "improper purpose," plaintiffs must prove defendant intentionally administered the tests improperly, with the purpose of disqualifying incumbent screeners because the open positions already had been filled by non-incumbent candidates.

PAGE 22 - OPINION AND ORDER

Because evidence suggests that the Phase II test administration may, in some cases, have affected plaintiffs' ability to pass the test for improper subjective reasons, e.g., applicants who were in fact qualified were not selected in violation of the alleged priority in hiring agreement, I cannot conclude as a matter of law, at least at the summary judgment stage, that no reasonable fact finder could find in favor of plaintiffs on their state law claims. Consequently, the following plaintiffs are entitled to proceed on the state law theory: Hector Aguirre, Emma Bradford, Mary Coco, William Damron, Judith Detmer, Gail Dixon, Russell Dooley, Karen Dutter, Sandra Espinoza, Leroy Fich, Melinda Gammage, Josephine Hill, Sharon Joslin, Roger Karr, Barbara Lugo, Faith Malcolm, Linda Ocampo, John Pridemore, Terry Pullen, Karen Sharr, Stanley Strong, Robert Tappert, and Diana Wadley.

My denial of summary judgment on those plaintiffs' state law claims should not be construed as implying that any plaintiff's state law claim will survive a motion for judgment as a matter of law at the end of plaintiffs' fact presentation or at the conclusion of the trial. Nevertheless, giving these 23 plaintiffs every benefit of the doubt, I deny defendant's motion as to them.

## CONCLUSION

Defendant's motion for summary judgment is granted in part and denied in part as follows:

1.    Defendant's motion for summary judgment on plaintiffs' Title VII, ADEA, and ADA claims is granted.

2.    Defendant's motion for summary judgment on plaintiffs' retaliation claims is granted.

PAGE 23 - OPINION AND ORDER

3.      Defendant's motion for summary judgment on plaintiff's state law claims is denied with respect to plaintiffs Hector Aguirre, Emma Bradford, Mary Coco, William Damron, Judith Detmer, Gail Dixon, Russell Dooley, Karen Dutter, Sandra Espinoza, Leroy Fich, Melinda Gammage, Josephine Hill, Sharon Joslin, Roger Karr, Barbara Lugo, Faith Malcolm, Linda Ocampo, John Pridemore, Terry Pullen, Karen Sharr, Stanley Strong, Robert Tappert, and Diana Wadley, and granted as to the remaining plaintiffs.

4.      The parties' motions to strike evidence (## 350, 421, 422, 423) are denied as moot with leave to raise any relevant objections to admissibility of the evidence at the final pretrial conference.

IT IS SO ORDERED.

DATED this 28th day of March, 2006.

_____
ROBERT E. JONES
U.S. District Judge

PAGE 24 - OPINION AND ORDER